FILED

2008 Aug-04  PM 12:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROY W. GRANGER, JR., individually,** | } | |
| **and on behalf of all similarly situated** | } | |
| **class members,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:05-CV-1696-RDP** |
| | } | |
| **SEARS ROEBUCK & CO.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

The court has before it Plaintiff Roy W. Granger, Jr.'s ("Granger" or "Plaintiff") Motion to Certify Class (Doc. # 52) filed February 29, 2008.  The motion has been fully briefed with respect to both issues identified by the parties (Docs. # 52, 64, 65, 67), and issues raised by the court *sua sponte* (Docs. # 68, 69, 70, 71).  A class certification hearing was held on May 9, 2008.  For the reasons outlined below, the motion is due to be denied.

## I.    Factual Background[1]

Defendant Sears, Roebuck & Co. ("Sears") sells home improvement products, including heating and air conditioning equipment ("HVAC systems") through in-home sales presentations. All of the HVAC systems sold by Sears come with manufacturer's warranties, although the terms

---

[1]The court abides by the well-settled principle of law that while it may look beyond the allegations of the complaint in determining whether a class should be certified, an assessment of Plaintiff's likelihood of success on the merits is inappropriate.  *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987).  These facts are recited for the limited purpose of providing background information related to the court's analysis of Plaintiff's class certification motion.  They may or may not be the "real" facts.

of each applicable warranty may differ from product to product.  In addition, Sears offers its own extended warranties known as "Protection Agreements," which include the higher-priced Master Protection Agreement ("MPA") and, as relevant to this case, the lower-priced Repair Protection Agreement ("RPA").

On January 20, 2005, following an in-home sales presentation by a Sears sales representative, Plaintiff Roy Granger purchased a Kenmore split-system heat pump air handler from Sears for a total cost of $11,130.00, which included an RPA.  The HVAC purchase agreement signed by Plaintiff does not reference a manufacturer's warranty and, according to Plaintiff, his Sears sales representative never discussed with him the manufacturer's warranty on the unit he purchased:

> Q:   When you bought the unit that we're talking about here, you understood, didn't you, that there was a manufacturer's warranty on that unit?
> A:   No, I did not.
> Q:   You thought that there wasn't a manufacturer's warranty on that unit, or were you just not sure?
> A:   No, Mr. Sutton said, 'it's a ten-year parts and labor warranty with this unit,' and that was basically it.
> Q:   So he didn't explain to you whether it was manufacturer's or something you had to pay extra for, at this time?
> A:   No, he did not.
> Q:   And you just didn't think about whether that was something you have to pay extra for or whether that was a standard warranty?
> A:   Well, it wasn't  - -
> Q:   It wasn't discussed?
> A:   He priced the units; and he said, 'This price and this price includes a ten-year parts and labor warranty'; and that was basically it.

(Granger Depo. at 55-57).  On four or five occasions prior to his January 2005 Sears purchase, Plaintiff purchased other HVAC systems, each of which was covered by a manufacturer's warranty. (Granger Depo. at 53-55).

2

A.     **Evidence Regarding Sears' Policies Concerning Disclosure of the Manufacturer's Warranty and RPA**

As part of their evidentiary submissions on the issue of certification, the parties have presented testimony from Sears employees regarding whether, and to what extent, the manufacturer's warranty is discussed with customers during in-home presentations.  Testimony from Sears' training managers indicates that it is Sears' official policy both to equip in-home sales representatives with copies of manufacturer warranties for their products and to train them to make those warranties available to their customers.

Nonetheless, record testimony from the actual sales representatives varies as to whether that policy translates into practice on a day-to-day basis.  Plaintiff points to testimony from certain Sears sales representatives indicating they do not carry with them full written warranties for HVAC products sold during their in-home presentations, while Defendant counters with testimony from other salespersons averring that they do carry manufacturer warranties to their in-home presentations.  Moreover, both parties point to testimony from yet other sales representatives whose practice is to show customers a "bullet point" summary of essential manufacturer warranty terms in lieu of presenting the actual warranty.  In any event, the evidence before the court suggests that there is no official procedure by which Sears verifies that sales representatives have complied with Sears' official policy regarding manufacturer warranties.

The testimony is likewise inconsistent regarding if, and when, customers receive a copy of the written RPA, if one is purchased during the in-home sale.  Although Defendant points to testimony that it is Sears' policy to give each customer a written copy of the RPA at the time of the HVAC/RPA sale, the evidence suggests that at least some sales representatives may not do so.

Plaintiff testified that he did until see the written RPA terms until he received a copy of the RPA in the mail several months after the purchase of his HVAC system.[2]  However, the sales agreement signed by Plaintiff at the time of his in-home sale references both the purchase of an RPA and the amount paid for it.

### B.    Relevant RPA Provisions

During the relevant time period, Sears used at least three different RPA forms.  Those forms contain identical arbitration and class action waiver provisions that provide as follows:

> ARBITRATION.   Any and all claims, disputes or controversies of any nature whatsoever (whether in contract, tort, or otherwise, including statutory, common law, fraud, other intentional tort, property and equitable claims) arising out of, relating to, or in connection with (1) this Agreement, (2) the relationships which result from this Agreement, or (3) the validity, scope, interpretation or enforceability of this arbitration provision or the entire Agreement ("Claim"), shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties, by final and binding arbitration before a single arbitrator.  All arbitrations shall be administered by the National Arbitration Forum ("NAF") or by JAMS in accordance with their respective Codes of Procedure in effect at the time the Claim is filed. . . .  Upon written request, we will advance to you either all or part of the fees of the NAF or JAMS and of the arbitrator. . . .  This arbitration Agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1, et seq. . . .  For the purpose of this arbitration provision Obligor shall be deemed to include SPC, Sears, Sears PR, all of their subsidiaries, affiliates, successors and assigns, their respective principals, partners, officers and directors, and all of the dealers, licensees, agents, and employees of any of the foregoing entities. . . .  YOU AND WE UNDERSTAND AND AGREE THAT BECAUSE OF THIS ARBITRATION CLAUSE NEITHER YOU NOR US WILL HAVE THE RIGHT TO GO TO COURT EXPECT AS PROVIDED ABOVE OR TO HAVE A JURY TRIAL, OR TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM.

---

[2]In 2005, after Defendant initially moved to compel arbitration based upon the terms of the RPA, Plaintiff averred by affidavit that he had not seen the RPA form prior to filing his lawsuit. Although Plaintiff clarified in his deposition that he did receive a written RPA before filing his lawsuit, Defendant chose not to renew its motion to arbitrate Plaintiff's claims.

(Doc. # 69-10 (Exhibit H, Bates No. 230-231), at No. 10; Doc. # 69-11 (Exhibit I, Bates No. 243-244), at No. 13; Doc. # 65-12 (Exhibit J, Bates No. 028-30), at No. 11).

All three forms also contain a cancellation/refund provision essentially providing customers with the absolute right to cancel the RPA and obtain a full refund during the first year of the RPA term. (Doc. # 69-10 (Exhibit H, Bates No. 230-231), at No. 6; Doc. # 69-11 (Exhibit I, Bates No. 243-244), at No. 9; Doc. # 65-12 (Exhibit J, Bates No. 028-30), at No. 7)).[3]  However, the RPA provides that each cancellation provision is subject to variances in state law, including a provision only applicable to Alabama residents that a "10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for refund." (Doc. # 69-11 (Exhibit I, Bates No. 243-244), at Nos. 15-2; Doc. # 65-12 (Exhibit J, Bates No. 028-30), at Nos. 13-23; Doc. # 69-10 (Exhibit H, Bates No. 230-231), at Nos. 12-24).

After the commencement of this lawsuit, but before the conclusion of his cancellation option period, Plaintiff was informed of his right to cancel the RPA and receive a refund, but he opted not to cancel.

## C.    Magnuson-Moss Act and Consent Decree

In the early 1990's, Sears was investigated by the Federal Trade Commission for allegedly violating the Magnuson-Moss Warranty Act (the "Act") with respect to the disclosure of

---

[3]The court has identified in the parties' evidentiary submissions a fourth version of the RPA form, which has the word "sample" stamped across it. (Doc. # 69-12 (Exhibit J, Bates No. 99-100)). It is not clear from the testimony whether this RPA was used for in-home sales or after-market sales (*i.e.*, telemarketing) (Jaffe Depo. at 71-73), but this version of the RPA contains different language regarding cancellation and states only generally that different state laws may impact the application of the cancellation policy. (Doc. # 69-12 (Exhibit J, Bates No. 99-100) at Nos. 12, 15)). Moreover, this apparent fourth version of the RPA also states that the customer will receive an RPA containing the exact terms and conditions of the agreement within thirty days of purchase. (Doc. # 69-12 (Exhibit J, Bates No. 99-100)).

manufacturer's warranties for consumer goods.  As a result, Sears entered into a Consent Decree mandating that it "would cease and desist from failing to make a text of any written warranty on a consumer product actually costing more than $15 readily available for examination by prospective buyers prior to sale through utilization of one or means specified in 16 C.F.R. §702.3(a), as amended."

Although Plaintiff's filings in this case repeatedly allude to Sears' alleged failure to comply with the Consent Decree and/or the Act, Plaintiff readily admits that he has only asserted state law fraud claims in this case and does not assert a claim based upon either Magnuson-Moss or the Consent Decree.[4]  Accordingly, neither the Act nor the Consent Decree is directly relevant to the court's certification analysis under Rule 23.

## II.    Claims Asserted and Proposed Class Definition

On August 9, 2005, Plaintiff filed his complaint, on behalf of himself and all others similarly situated in Alabama, Tennessee and Florida, alleging that he purchased a HVAC unit and RPA from Sears via an in-home sale, and that at the time of purchase, Sears suppressed the terms of the manufacturer's warranty in violation of applicable law.[5]

Plaintiff asserts two claims on behalf of himself and the putative class, both of which sound in state law fraud.  Count One, fraudulent concealment, avers: "Defendant had a duty to disclose the

---

[4]In any event, Sears is quick to note that it is not required by Magnuson-Moss to hand a copy of the manufacturer's warranty to its customers during a sales presentation, as the Act requires only that Sears' sales representatives disclose to customers that written warranties are available for inspection, should the customer desire.  *See* 15 U.S.C. § 2302(b); 16 C.F.R. § 702.3.  The Consent Decree does not impose any additional legal duties other than those created by the Act itself.

[5]Although Plaintiff previously sought to expand the class beyond the HVAC and RPA purchased by him to other products and protection agreements that he did not purchase during Sears' home visit, the court denied his request.  (Docs. # 25, 26).

manufacturer's warranty to Plaintiff prior to purchase. Defendant concealed the existence of the manufacturer's warranty and in doing so, concealed a material fact. As a result of Defendant's concealment, Plaintiff was induced to act to his detriment by purchasing a RPA from Defendant." (Doc. # 1, Count One).   Count Two, fraudulent suppression, asserts "Defendant had a duty to disclose the manufacturer's warranty to Plaintiff prior to purchase. Defendant suppressed the existence of the manufacturer's warranty and in doing so, suppressed a material fact. As a result of Defendant's suppression, Plaintiff was induced to act to his detriment by purchasing a RPA from Defendant." (Doc. # 1, Count Two).   Notably, although Plaintiff has sought to amend the complaint on two occasions (once to broaden the class to include non-HVAC products and protection agreements and once to add negligent entrustment, negligent supervision, and Magnuson-Moss Warranty Act claims, both of which were denied) (Docs. # 25, 26, 62, 63), he has never sought to alter or otherwise modify these core fraud claims.

Even though Plaintiff's two fraud claims have been static, his proposed class definition has been a moving target.  He has presented to the court, at best count, three or four different versions of the class definition, two of which were asserted even after the filing of this motion to certify. (Doc. # 1 (Plaintiff's August 9, 2005 complaint[6]); Doc. # 52 (Plaintiff's February 29, 2008 motion for certification[7]); Doc. # 64 (Parties' April 4, 2008 joint status report[8]); Plaintiff counsel's

---

[6]The complaint proposed the following definition:  "[C]onsumers who purchased HVAC units from Defendant under the following circumstances: (1) purchase of the unit(s) occurred in Plaintiff's home and/or other private property following an in-home visit by a Sears representative; (2) the existence of a manufacturer's warranty for the unit(s); and (3) Defendant failed to disclose the existence of a manufacturer's warranty."  (Doc. # 1, at ¶ 16).

[7]Plaintiff's motion for class certification revised the definition as follows:  "All individuals in Alabama, Tennessee and Florida, who, during the period from 2000 to present, purchased a Protection Agreement as a result of Sears' suppression of the manufacturer's warranty." (Doc. # 52,

statements at the May 9, 2008 hearing[9]).  Based upon those prior definitions, and taking into account

prior orders ruling on Plaintiff's amendment requests,[10] the court has cobbled together the following

comprehensive class definition:

> Customers in Alabama, Florida, and Tennessee who, during the period from 2000 to present,  purchased an HVAC unit and a Repair Protection Agreement from Sears when: (1) purchase of the unit(s) occurred in the  customer's home and/or other

_____

at 32).

    [8]In the parties' joint status report, Plaintiff appears to return to his original complaint definition: "[C]onsumers who purchased HVAC units from Defendant under the following circumstances: (1) purchase of the unit(s) occurred in Plaintiff's home and/or other private property following an in-home visit by a Sears representative; (2) the existence of a manufacturer's warranty for the unit(s); and (3) Defendant failed to disclose the existence of the manufacturer's warranty." (Doc. # 64, at 2).

    [9]At the May 9, 2008 hearing - almost three years after this case was initially filed - counsel for Plaintiff sought to broaden the class definition to its widest scope yet, proposing that the class be comprised of **all** individuals in Alabama, Tennessee and Florida, who, during the period from 2000 to present, purchased a Repair Protection Agreement, without regard to whether that purchase occurred "as a result of Sears' suppression of the manufacturer's warranty." Although counsel for Plaintiff believes the omission of that qualifying phrase to be a distinction without a difference, the court disagrees.  To the contrary, it is a very distinct difference that impermissibly would broaden the class beyond the scope of the claims asserted in this case.  Indeed, if the court were to adopt this broad definition - which incidentally has not been subject to discovery or other investigation by Defendant - the court would be required to conduct an individualized inquiry into each class member's circumstances to determine under Rule 11 if he can even claim that suppression or concealment of the manufacturer's warranty induced him to purchase an RPA.  It is axiomatic that "the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).  Accordingly, certification is improper "where the number of individualized determinations required to determine class membership becomes too administratively difficult." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 662 (S.D. Ala. 2005); *see also Murray v. Auslander*, 244 F.3d 807, 813 (11th Cir. 2001).

    [10]On November 17, 2006, the court denied Plaintiff's request to significantly broaden the class beyond the HVAC and RPA purchased by Plaintiff to other non-HVAC products and protection agreements that Plaintiff did not purchase during Sears' home visit. (Docs. # 25, 26). On March 28, 2008 and April 2, 2008, the court issued orders collectively denying Plaintiff's requests to add negligent supervision, unjust enrichment, and Magnuson-Moss Warranty Act claims to his complaint. (Docs. # 62, 63).

8

private property following an in-home visit by a Sears representative; and (2) purchase of the Protection Agreement occurred as a result of Sears' suppression or concealment of the existence of a manufacturer's warranty for the unit.[11]

The court believes that the above class definition most accurately reflects the culmination of Plaintiff's proposed definitions while still remaining true to his fraud claims actually asserted in this case.

## III.    Substantive Analysis

The determination of whether an action should proceed as a class action under Rule 23 is left to the sound discretion of the district court. *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1347 (11th Cir. 1983). Nevertheless, Plaintiff has the burden to prove to the court that a class should be certified. *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). Thus, this court's function is to perform a "rigorous analysis" of Plaintiff's asserted satisfaction of the requirements for class certification. *General Telephone Co. v. Falcon*, 457 U.S. 147, 160-61 (1982).

---

[11]After the February 2008 filing of Plaintiff's motion to certify, Defendant requested that this court strike what it deemed to be Plaintiff's "implied" amendment to the class definition. (Doc. # 61). According to Defendant, although Plaintiff's earlier class definitions were limited to those affected by suppression of the *existence* of the manufacturer's warranty, Plaintiff's motion to certify broadened the class to include not only those to whom the existence of the warranty was suppressed, but also those who were not told of its terms. Defendant primarily was concerned that the implied amendment would broaden the class to include those customers who were told about the manufacturer's warranty but not informed of its particular terms. (Doc. # 61, at 2). The court informed the parties that it would not rule on this matter until it considered the merits of class certification in total.

After a complete review of the arguments and evidence in this case, the court has determined that whether the class definition includes those to whom the existence of the manufacturer's warranty was suppressed and/or those to whom the terms of the warranty were suppressed is of no moment. The court's decision to deny class certification would not be substantially altered if this "implied" amendment were allowed to stand. Indeed, the court is of the opinion that if such an "implied" amendment is sought by Plaintiff, it does nothing more than add yet another layer of individualized inquiry to the already substantial list outlined by the court in its analysis of Rule 23(b)(3) certification. *See* Section III(B)(3)(a)(I), *infra*. Accordingly, if anything, such an "implied" amendment tends toward Defendant's favor.

It is well-settled that to warrant certification of a class action, the named plaintiff(s) must have standing, and the putative class must meet each of the four requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b). *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir.2002); *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1025 (11th Cir.2001). Because the issue of standing is not in dispute in this case–and in any event, the court finds no basis to conclude that Plaintiff lacks standing to bring the claims in this case–the court's analysis will focus on the Rule 23(a) and (b) factors.[12]

---

[12]Although Defendant presents the issues of arbitration and class action waiver (both of which are contained as provisions in the written RPA) as threshold matters that the court must decide prior to reaching the Rule 23 analysis, the court finds, for reasons more fully explained in Section III(B)(3)(a)(I), *infra*, that these matters cannot be resolved as a matter of law and on a class-wide basis at the certification stage. Indeed, the court's attempt to resolve those matters as threshold questions applicable to all class members - *i.e.,* whether any and all of the claims in this case can proceed in the form of a class action, or even in this court at all – has accomplished nothing more than to breed numerous other inquiries concerning the enforceability of those provisions with respect to each class member's claims, none of which can be answered generically on behalf of the putative class as a whole. Indeed, that a particularly individualized inquiry is required to determine the enforceability of the arbitration provision as it relates to the circumstances of each class member's RPA purchase is a principal reason why this class cannot be certified. *See* discussion Section III(B)(3)(a)(I), *infra.* Accordingly, the court considers these arguments in its analysis of the Rule 23(b)(3) requirements.

In so doing, the court rejects Plaintiff's contention that Defendant's admitted waiver of its right to compel arbitration of *his* claims translates into a class-wide waiver of the right to seek compulsion of arbitration as to any class member. Aside from the fact that the shifting definition of the putative class has certainly made it difficult for Defendant to appropriately evaluate its position on class-wide arbitration, the court has identified no binding (or, for that matter, persuasive) caselaw to suggest that the same policies underlying waiver of the right to assert arbitration as to an individual plaintiff (*i.e.,* deterring defendants from taking advantage of merits discovery in a court of law that otherwise would be prohibited in a court of arbitration) apply at the class certification stage when the court has permitted only limited discovery related to certification issues. Indeed, it would be counterintuitive to require a defendant to assert its right to arbitration with respect to hypothetical class members who are merely putative, and not yet certified or identified.

Additionally, because the court cannot - and will not - make a class-wide determination regarding enforceability of the RPA arbitration provision, the court likewise cannot rule on the enforceability of the class action waiver contained in that same provision. To do so would be to put the cart before the horse. Accordingly, the court expresses no opinion on the application of *Dale v.*

10

### A.      The Four Factors of Rule 23(a)

Rule 23(a)[13] contains four threshold requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  The court begins with an analysis of the first and last requirements - numerosity and adequacy of representation - because it finds those prerequisites to be met in this case.  Nonetheless, fatal to Plaintiff's request for class certification is the court's finding that the remaining two requirements of commonality and typicality, which overlap to some degree, are deficient as to the purported class in this case.

### 1.      Numerosity

Under Rule 23(a)(1), a class action may be maintained only if the class is so numerous that joinder of all class members is impracticable.  *Dujanovic v. Mortgage America, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999); *Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 553 (S.D. Fla. 2001).  Whether joinder is practicable depends on many factors including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined, and their geographic dispersion.  *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (finding that class of at least 31 individual class members from a wide geographic area

-----

*Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007) to the facts of this case.

[13]Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

met the numerosity requirement).  If the court can draw reasonable inferences from the facts before it as to the approximate size of the class and the infeasibility of joinder, the numerosity requirement is satisfied. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) ("Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class.  Furthermore, the relevance of the numerosity requirement to class certification may in appropriate cases be less significant where in fact class wide discrimination has been alleged . . . "); *Dujanovic*, 185 F.R.D. at 666 ("this court may 'make common sense assumptions' to support a finding of numerosity").

Here, the court finds ample support for the conclusion that the size of the putative class makes joinder impracticable. As evidenced by documents disclosed by Defendant, over 12,000 RPAs were sold in Alabama, Tennessee, and Florida during a three-year portion of the relevant eight-year time period.  (Doc. # 54, Ex. C (Bates No. 363, "Customers Purchasing RPA")).  Thus, because the proposed class numbers in the thousands, the court finds that the element of numerosity is satisfied. *See, e.g., Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (explaining that "while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate . . . '"); *Terazosin*, 203 F.R.D. at 553 ("finding that a class of over one thousand satisfied the numerosity prerequisite"); *In re Consolidated "Non-Filing Insurance" Fee Litig.*, 195 F.R.D. 684, 693 (M.D. Ala. 2000) (finding that a class of thousands of policyholders satisfied the numerosity prerequisite).

### 2.    Adequacy of Representation

Rule 23(a) also requires Plaintiff demonstrate adequacy of representation, which the courts have extended to two areas:   (1) the competency of class counsel to handle the case; and (2) the

absence of disabling conflicts of interest between the named Plaintiff and among the class members. *Griffin v. Carlin*, 755 F.2d 1516, 1532-33 (11th Cir. 1985); *"Non-Filing Insurance" Fee*, 195 F.R.D. at 691.  Both requirements are met here.

As to the first matter of counsel competency, the court takes note that the lawyers assembled to represent Plaintiff and the putative class are knowledgeable and experienced class action attorneys who have successfully litigated complex commercial litigation, including insurance class actions, RICO, ERISA, securities actions, and anti-competitive practices claims.  There is no reason to believe that Plaintiff's counsel will not prosecute this case with their usual high degree of diligence, skill, and vigor.

As to the second issue of potential conflicts, the court finds no evidence that Granger possesses disabling interests inconsistent with those of the class.  He has also demonstrated the willingness and ability to pursue the claims vigorously, as evidenced by his deposition, production of documents, and his submission of affidavit testimony in support of other issues in this case.  Thus, subject only to its discussion in footnote 14 *infra*, the court finds no barriers to satisfaction of the Rule 23(a)(4) adequacy of representation requirement.

### 3.    Commonality and Typicality

Despite the satisfaction of the numerosity and adequacy requirements, however, Plaintiff's request for class certification fails because he cannot establish the Rule 23(a)(2) and (a)(3) prerequisites of commonality and typicality.  Commonality under Rule 23(a)(2) requires that the grievances of Plaintiff and the class members share a common question of law or of fact, while typicality under Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(2), (a)(3).  The Eleventh Circuit

has found the commonality element to be satisfied whenever "[t]he claims actually litigated in the suit [are] fairly represented by the named plaintiffs." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1567 (11th Cir. 1986). Likewise, the typicality requirement is met when the named plaintiff's claim arises "from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

The court addresses these two prerequisites together here because, as noted by many courts, the commonality and typicality requirements involve similar considerations and "tend to merge." *E.g., General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Both requirements "serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. And in this case, because Plaintiff fails to establish commonality and typicality for the same reason, the court finds that his claims are fatally distinguishable from those of the putative class.

Although Plaintiff has argued that commonality and typicality are not usually "destroyed by mere dissimilarity in factual patterns between the class and its representative," *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 522 (M.D. Ala. 1992), the distinctions between Granger's claims and those of the putative class are not merely factual – they are legal in nature. As outlined in Plaintiff's motion for class certification, the claims of the class are based upon a theory of concealment or suppression **of the manufacturer's warranty** which in turn induced purchase of Sears' own extended RPA warranty:

14

> In light of the Defendant's admitted failure to insure that its sales representatives are making the necessary disclosures during an in-home sale . . . , each member of the class has been deprived of the legally required disclosures regarding the manufacturer's warranty at the time of their in-home HVAC sales presentation.  As a result, each member of the class was induced to purchase the same or a similar standard form Protection Agreement (*i.e.* extended warranty) from Sears in conjunction with their HVAC purchase.   The purchase of these Protection Agreements was a direct result of Sears' suppression of information that was material to the decision to purchase the protection agreement; namely, that ample warranty coverage was already available to the customer, and further that the manufacturer's warranty provided coverage which, in most cases, overlapped that which was being offered through Sears' protection agreement . . . .In short, the harm to each class member arises out of the exact same course of conduct – Sears' uniform suppression of the manufacturer's warranty certificate, as required under the law, as well as the Consent Decree, and thereby, inducing purchase – at additional profit to Sears – of Sears' own extended warranty.

(Doc. # 52, at 43-44).   Plaintiff emphasizes in his complaint that the principal common questions of fact and law among class claims are: (1) whether Defendant failed to disclose the manufacturer's warranty to consumers; and (2) whether consumers purchased an RPA from Defendant as a result of Defendant's failure to disclose the existence of the manufacturer's warranty. (Doc. # 1, at ¶ 23). In other words, the putative class members allegedly knew they were paying something beyond the purchase price of the HVAC system in order to buy an extended warranty or RPA, and the reason why they made that conscious decision to buy an RPA is because Sears failed to give them adequate information about the standard manufacturer's warranty which was provided automatically and at no additional cost beyond the purchase price of the HVAC unit.

By contrast to the putative class members who knowingly purchased the RPA (albeit allegedly as a result of fraud), Granger readily admits that he was not even aware that he purchased the RPA at the time of his in-home HVAC sale.  (Granger Depo. at 56-57 (Q: So he [*i.e.*, the Sears sales representative] didn't explain to you whether it [*i.e.*, the RPA] was manufacturer's or

15

something you had to pay extra for, at this time? A: No, he did not.); Granger Depo. at 62-63 (Q: When you bought this unit from Sears in January 2005, did you think you were paying for a warranty separate and apart from the price of the unit itself? A: No.  I thought that I was paying this amount, $11,130, for the unit, that included a ten-year parts and labor warranty.); Doc. # 70, at 24 ("[T]he RPA agreement, again, which Plaintiff was unaware he had even purchased, was neither signed nor accepted by the Plaintiff.")(emphasis added)).  Given Plaintiff's own admission that he unknowingly purchased the RPA, he no longer can claim that he purchased the RPA because the manufacturer's warranty was concealed or suppressed by Sears.

Indeed, Granger's most recent court filings emphasize the divergence of his legal theory from that of the putative class.  In a nutshell, he claims that Defendant engaged in a common scheme of fraudulent concealment of the *purchase of the RPA itself*, not the manufacturer's warranty.  (Doc. # 70, at 24) ("Instead, the Plaintiff alleges -- and the evidence reflects -- that Sears has engaged in a scheme to fraudulently conceal and suppress the fact that the Plaintiff and putative class **were purchasing an extended warranty (or Protection Agreements) in conjunction with their HVAC purchase**.")(emphasis added).

The class claims in this case have not changed; rather, the evidence fleshing out the circumstances of Plaintiff's purchase has morphed Plaintiff's claim into a different theory.  It is no longer appropriate for Plaintiff, who did not even know he was buying and paying for an RPA, to represent the interests of customers in a completely different posture, *i.e.*, customers who (allegedly) knew they were buying an RPA and did so only because they (allegedly) believed they had to in order to obtain sufficient warranty protection.  The substantive difference between Plaintiff's claims and those of the putative class is fatal to his request for class certification.  Because Plaintiff's legal

16

theory is not the legal theory asserted by the class he seeks to represent, Defendant's alleged practices did not adversely affect Plaintiff and the other proposed Class Members "in the same general fashion." *Kornberg*, 741 F.2d at 1337.[14]  Thus, commonality and typicality are absent and, for this reason alone, class certification is inappropriate.

### B.    The Three Types of Certification under Rule 23(b)

Although the court need not reach the Rule 23(b) analysis because it has found two of the Rule 23(a) prerequisites to be deficient, the court alternatively and additionally finds that class

---

[14]In addition to this distinct legal difference between Granger's theory of recovery and that of the putative class members, the court is concerned about several other circumstances that set Granger's claims apart from those of the putative class and bear on the issues of commonality and typicality.  Given that the claims in this case sound solely in fraud, of which reliance is an essential element, it is particularly noteworthy that Granger possesses expertise far beyond the ordinary consumer when it comes to purchasing HVAC systems – indeed he admits purchasing four or five HVAC units, all with manufacturer's warranties, prior to the purchase of the Kenmore unit that is the subject of this lawsuit.  Given that extensive knowledge and experience, the court questions whether Granger's reasonable reliance analysis will be typical or common of class members, most of whom are undoubtedly less experienced in the purchase of HVAC units and the warranties that adhere to them. Moreover, the court questions whether Granger's claims will be typical or common of class claims in light of the fact that he - unlike other class members - was expressly told of his right to cancel the RPA and receive a full refund within the applicable cancellation policy, yet after the RPA was actually purchased.  Indeed, that opportunity to recover at least part of his actual damages was offered to Granger during the course of this litigation, but he refused.  Because Granger chose not to exercise that option when given the express chance to do so, his claims may also be atypical or uncommon of the claims of class members who were unaware of their cancellation right and/or not given adequate opportunity to exercise that option and recover their damages.  As noted by the Eleventh Circuit, "[t]he existence of even an arguable defense can vitiate the adequacy of representation if it will distract the named plaintiff from the issues common to the class."  *Ross v. Bank South, N.A.*, 837 F.2d 980, 990-91 (11th Cir. 1988) (noting that unique defenses can be considered under the typicality, commonality or adequacy requirement), *vacated*, 848 F.2d 1133 (11th Cir. 1988), *on rehearing*, 885 F.2d 723 (11th Cir. 1989) (en banc); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2nd Cir. 1990), cert. denied, 498 U.S. 1025, 112 L. Ed. 2d 667, 111 S. Ct. 675 (1991) ("[Class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").

certification is inappropriate because none of the Rule 23(b) options for certification can be satisfied in this case.[15]   The court will address each of the three types of 23(b) classes in turn.

---

[15]Rule 23(b) provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b).

1.        23(b)(1)

As to Plaintiff's summary request for certification under Rule 23(b)(1), the court will not devote a significant amount of time discussing why this civil action, which seeks money damages for alleged fraudulent omissions, falls outside of the narrow category of cases appropriate for 23(b)(1) class treatment.  Rule 23(b)(1) allows certification of classes when individual claims run the risk of:

> (A)    inconsistent or varying adjudications . . . which would establish incompatible standards of conduct for the party opposing the class, or

> (B)    adjudications . . . which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . .

Fed. R. Civ. P. 23(b)(1).[16]  In order to qualify for treatment under this section, "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members."  *Ortiz*, 527 U.S. at 834.

As an initial matter, this case is not of either type of "shared character" claims.  Pursuant to the law of this Circuit, a case cannot be certified under Rule 23(b)(1)(A) if the complaint seeks compensatory damages.  *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 (11th Cir. 2000) ("Because Cohen's class seeks compensatory damages, it cannot be certified as a (b)(1)(A) class."); *In re Dennis Greenman Sec. Litigation*, 829 F.2d 1539, 1545 (11th Cir. 1987) (holding that "Rule 23(b)(1)(A) does not apply to actions seeking compensatory damages").

_____

[16]Examples of cases appropriately certified under Rule 23(b)(1) "may, for example, be found in suits brought to reorganize fraternal benefit societies; actions by shareholders to declare a dividend or otherwise fix their rights; and actions charging a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries, requiring an accounting or similar procedure to restore the subject of the trust."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999) (citations omitted).

Here there is no doubt that Plaintiff's complaint requests compensatory damages – all counts request monetary relief. Moreover, with respect to the Rule 23(b)(1)(B) class type, the court agrees with Defendant that "Plaintiff cites no case law for this position because there is none. Plaintiff cannot contend with a straight face that individual class members would be prejudiced by conflicting decisions if the class is not certified. Nor does Sears contend that it would be prejudiced if the class were not certified." (Doc. # 65, at 31-32). The claims of particular class members do not overlap to the point that conflicting decisions would prejudice recovery. Nor is this a limited fund case where each plaintiff's potential recovery is affected or prejudiced by the recoveries awarded to other class members. Accordingly, the court finds no basis to consider certification of the putative class under Rule 23(b)(1).

### 2.      Rule 23(b)(2)

Class certification under Rule 23(b)(2) requires: (1) class members must have been harmed in essentially the same way by the defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)("[T]he claims contemplated in a (b)(2) action are *class* claims, claims resting on the same grounds and applying more or less equally to all members of the class.") (emphasis in original). Where these requirements are met, the class members' interests are sufficiently cohesive that absent members will be adequately represented. *Holmes*, 706 F.2d at 1155 n.8 ("[T]he (b)(2) class is distinguished from the (b)(3) class by class cohesiveness . . . [i]njuries remedied through (b)(2) actions are really group, as opposed to individual injuries."); *see Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are

20

cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members."). Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The claims in this case do not fall within the ambit of 23(b)(2).  The remedies sought by Plaintiffs do not seek relief for a common injury, nor is injunctive or declaratory relief the predominant remedy sought by Plaintiffs.  It is well-settled that "[d]amage claims in a Rule 23(b)(2) class action must be **incidental** to the equitable and declaratory relief because the basic premise of such a class action - that class members suffer a common injury properly addressed by class-wide equitable relief - 'begins to break down when the class seeks to recover. . . monetary relief to be allocated based on individual injuries.'"  *Cooper v. Southern Co.*, 390 F.3d 695, 720 (11th Cir. 2004) (citation omitted).  In this case, the complaint indicates that the opposite is true - any equitable relief sought is merely incidental to the damage claims.  Although Plaintiff's motion for class certification asserts that he seeks "restitution" and "declaratory" relief (Doc. # 52, at 51),  neither of those terms appears anywhere in the complaint.  Rather, each count in the complaint, including the "Equitable and Injunctive Relief" count, seeks "damages." (Doc. # 1, at ¶¶ 27, 31, and 36).

Moreover, the Eleventh Circuit has interpreted "incidental" monetary damages to be that monetary relief that "flow[s] directly from liability to the class as a whole." *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (reversing certification of Rule 23(b)(2) class when plaintiffs sought compensatory damages based upon their own particular injuries). In *Murray*, the court noted:

> By incidental, we mean damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief. . . . Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established. . . . Liability for incidental damages should not . . . entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Murray*, 244 F.3d at 812 (quotations omitted).   Here, there is no liability to the class as a whole.

Each individual class member's claim seeks individual damages caused by the alleged individual

misrepresentations or omissions.[17]  Accordingly, the court finds that certification is not proper under

Rule 23(b)(2).

    **3.      Rule 23(b)(3)**

    Finally, the court examines whether the putative class in this case may be properly certified

under Rule 23(b)(3), which is the marquee argument advanced by Plaintiff.  Class certification under

this definition is appropriate if "the court finds that the questions of law or fact common to the

members of the class predominate over any questions affecting only individual members, and that

a class action is superior to other available methods for the fair and efficient adjudication of the

controversy." Fed. R. Civ. P. 23(b)(3).

> In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' . . . Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Report for the 1966 amendments cautioned:

---

[17]That Plaintiff has alleged a "common scheme" of failing to disclose the warranties is inapposite.  Whether or not a particular plaintiff reasonably relied on the suppression or concealment of those warranties to his detriment by purchasing an RPA is a purely individual question that does not seek a "group remedy" or result in damages awarded to the whole.

'The new provision invites a close look at the case before it is accepted as a class action . . .'

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citations omitted).

Thus, with respect to the Rule 23(b)(3) analysis, the court must examine each alleged cause of action and "consider what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000). An analysis of the predominance and superiority factors follows.

### a.    Predominance

Predominance exists if the issues subject to general proof, and thus applicable to the class as a whole, predominate over those issues susceptible only to individualized proof. *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. Unit B 1982). Indeed, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," and it is "far more demanding" than the Rule 23(a) commonality requirement. *Amchem Products, Inc.*, 521 U.S. at 623. In this case, the court finds a long list of issues susceptible only to individualized proof that demonstrate the class is simply not cohesive enough to warrant certification. They are outlined below.

### i.    The Question of Arbitration

The court begins its litany of individualized inquiries with the question of whether class members are bound to arbitrate their claims and/or have sufficiently waived their right to pursue class treatment of their claims. Although the Federal Arbitration Act ("FAA") generally applies to the arbitration provisions at issue here,[18] that statute provides that questions of validity, revocation,

---

[18]Three or four different RPA forms have been utilized by Sears during the timeframe relevant to this lawsuit, all of which contain a substantially identical arbitration provision. There

and enforceability are determined by **state law** as it applies generally to all contracts.  9 U.S.C. §2;

*Perry v. Thomas*, 482 U.S. 483, 492 n. 9 (1987).  In other words, the law of the state where the class

member purchased the RPA - either Alabama, Florida, or Tennessee under Plaintiff's proposed class

definition - governs the question of whether that class member's RPA's arbitration clause is invalid,

revocable, or other unenforceable.  Thus, the court can only assess whether a class member is bound

by the RPA's arbitration and class waiver provisions by applying the applicable state law to the

particular facts and circumstances of that class member's RPA purchase.

Such an inquiry into the particular facts of each transaction will not only be different for each

plaintiff, but it will be multi-faceted as to each plaintiff.  For example, one argument for invalidating

the arbitration agreement in this case is Plaintiff's assertion that Sears failed to provide its RPA

purchasers with a written copy of agreement terms, thus calling into question whether the purchaser

actually assented to the arbitration provision.  The resolution of this one question creates its own

"decision-tree" of additional inquiries regarding if, and when, that customer received a copy of the

RPA he purchased.  As to those customers who never received a written RPA (either at the point of

sale or later by mail), it may well be that the law of all three relevant states would render the

arbitration provision unenforceable.[19]  That is the case unless the customer's sales contract, as

_____

appears to be no dispute between the parties that the transaction in question involved interstate
commerce.  The arbitration provision itself recites that reality. (Doc. # 69-10 (Exhibit H, Bates No.
230-231), at No. 10; Doc. # 69-11 (Exhibit I, Bates No. 243-244), at No. 13; Doc. # 65-12 (Exhibit
J, Bates No. 028-30), at No. 11).  Thus, there is little question that the FAA governs this portion of
the parties' dispute.

[19]Indeed, that very assumption is what prevented the court from ruling on Defendant's early
motion to compel arbitration and to strike Plaintiff's class claims, which cited the arbitration
provision of the RPA.  (Doc. # 10).  Defendant's motion was filed in the early stages of the case
before any discovery had been conducted.  Accordingly, Plaintiff persuaded the court to deny the
motion (without prejudice) based on Plaintiff's sworn statement that he had never received a written

modified by the sales representative who wrote the terms of the contract onto the form, referred to

any specific RPA terms and/or arbitration or class waiver such that actual receipt of the written RPA

document would not be required for a finding of assent.  On the other hand, as to those customers

who did not receive the written RPA at the time of sale but later received it in the mail (like

Granger), a ruling on assent and enforceability would require yet another inquiry into whether the

customer received the written RPA within the cancellation/refund period during which he could

reject the arbitration provision post-sale and without penalty to him.[20]  It is at this point that the law

of the three designated class states may diverge and may produce different results as to the effect of

the cancellation provision on enforceability.[21]  As is evident, a myriad of individualized inquiries are

---

copy of the RPA and counsel's representation that a legitimate question existed as to whether the RPA forms were even used or disbursed to customers.  (*See* Doc. # 12 ("I never received [the RPA] with the purchase of the unit, nor did I receive it at any time since purchase of the unit. . . .").  Although Plaintiff later recanted his prior testimony and admitted that he did indeed receive a copy of the RPA in May or June of 2005 before filing this lawsuit, (Granger Depo., at 10-12), the significance of his initial testimony is clear.  Had Plaintiff never received the written RPA containing the arbitration provision, state law may have rendered the provision unenforceable due to lack of assent.

[20]The court would also need to inquire as to whether the customer elected to cancel or opt out of the RPA coverage during the exclusion period, which would certainly affect his damages in addition to invalidating the arbitration provision.

[21]For example, Defendant has argued that, pursuant to Alabama law, the cancellation provision of the agreement is sufficient to make the arbitration provision binding, even if a customer didn't receive a copy of the RPA until sometime after purchase.  (Doc. # 65, at 14-15)(citing *Philadelphia American Life Ins. Co. v. Bender*, 893 So.2d 1104 (Ala. 2004)( finding that a party who has the right to cancel a contract, but fails to do so, is bound by an arbitration provision in that contract, even if he did he did not receive the contract until after a dispute had arisen); *UBS PaineWebber v. Brown*, 880 So.2d 411, 414-15 (Ala. 2003) (finding that the analysis of whether an agreement to arbitrate exists cannot be confined to the point when the transactions made the basis of this action took place)). Whether this same legal principle applies in the other relevant states has not been argued or otherwise developed before the court.

required - each producing different results - before the court can make a pronouncement regarding enforceability of the RPA's arbitration provision.

Indeed, the weight and burden of conducting such an individualized inquiry into the enforceability of each class member's arbitration provision is enough to warrant denial of certification.  But there is more. Even if a class member escapes the arbitration and class waiver provisions of the RPA, there are even more individualized questions that must be answered before he can proceed as a class member in this case.

### ii.      The Questions Applicable to the Class Claims

Under the laws of all three designated class states, Plaintiff's fraudulent suppression and concealment claims require proof of: (1) a duty to disclose the facts based upon a confidential relationship or the particular case circumstances; (2) concealment or non-disclosure of the facts by the defendant; (3) materiality of the fact not disclosed; (4) the plaintiff's reliance on the non-disclosure; (5) reasonableness of the plaintiff's reliance under the circumstances; (6) proximate cause; and (7) injury to the plaintiff.  *See, e.g., General Motors Corp. v. Bell*, 714 So. 2d 268, 280 (Ala. 1996).  Each plaintiff must show that the alleged suppression or concealment induced him to purchase an RPA – in other words, that he would not have purchased an RPA had the disclosure been made. *See Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 372 (Tenn. Ct. App. 2006) ("The tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury."); *D.O.P. Invs. v. Oakland Hills Joint Venture*, 909 So. 2d 355, 356 (Fla. Dist. Ct. App. 4th Dist. 2005) (fraud requires proof of justifiable reliance).

As the Alabama Supreme Court has made clear, the "reasonable reliance" standard utilized in fraud cases was crafted to permit and require such an individualized determination: "to allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421-22 (Ala. 1997). Accordingly, the question of reliance is – by operation of state law – an individualized inquiry that takes into account all of the circumstances surrounding a particular transaction in addition to the customer's educational background, business sophistication, and bargaining power.

Against that background of applicable law, the court has identified four independent inquiries (in addition to those regarding arbitration, outlined *supra*) that must be made with respect to each class member. First, the court will have to determine whether the warranty was suppressed from a putative class member. This determination cannot be made on a generalized basis – that is, the court cannot assume that the information was suppressed from all customers. The parties do not dispute that it is Sears' official policy for its sales representatives to make warranties available to customers.[22] The parties also do not dispute that some representatives may follow the policy while

_____

[22]The court is befuddled by Plaintiff's repeated assertion that "Defendant's policy and practice, as admitted by both Sears' in-home sales representatives and its 30(b)(6) corporate representatives responsible for implementing the policies and procedures to be utilized by its in-home sales representatives, [is one of] failing and refusing to timely present, disclose or make available to the customer the actual terms of the manufacturer's warranty at the time of the sales presentation." (Doc. # 52, at 40). Indeed, as outlined earlier in the factual recitation, the only official policy is that sales representatives were to carry manufacturer's warranties with them to in-home presentations and disclose their availability for inspection. This point is not disputed by either party. That many sales representatives may not have followed that policy, as evidenced by the disparate evidence offered by the parties regarding what actually occurred day-to-day, simply is not an indication that Sears had a uniform policy instructing its salesmen to hide copies of the

others do not.   Accordingly, an individualized inquiry – customer by customer – will be required to determine whether the suppression indeed occurred.

Second, if a suppression is found to have occurred as to a class member, the court will still have to determine whether that customer had independent knowledge that his HVAC unit came with a manufacturer's warranty.  That knowledge could originate from prior purchases of HVAC units, or general knowledge about warranties, or even comparison shopping of HVAC units before purchasing the subject product from Sears.  Sears may not be liable to customers who already know about warranty protection, because it follows that Sears cannot suppress or conceal from a customer a previously known fact.

Third, the court will need to determine whether the "suppression" was the reason why the customer bought a protection agreement.  This is true both because of the proposed class definition (*i.e.*, customers who bought a protection agreement "as a result of" – that is, due to – the suppression) and because reliance, or inducement, is a *prima facie* element of the fraud claims in this case under the relevant law of all three states included in the proposed definition. The court cannot simply assume that all customers would not have purchased the RPA but for the alleged suppression, especially when the evidence of record indicates that some customers who were fully aware of the manufacturer's warranty nevertheless bought RPAs.  Indeed, the coverage of the manufacturer's warranty and the RPA overlaps, but the RPA apparently provides broader coverage for labor in many cases.  Thus, one question would be whether certain customers thought the RPA was "a good deal" and worth tacking on to the manufacturer's warranty.  Yet other customers may have been told of

---

manufacturer's warranty.  Any variations in the degree of disclosure given by various Sears sales representatives was not a "policy."  Indeed, those variations actually support the need to gather individualized proof as to what each salesperson said to each customer.

the manufacturer's warranty and offered to inspect it, but declined to do so or simply were not interested in the particulars of the manufacturer's warranty.[23]  Still others may (as Plaintiff alleges) have been duped into buying the RPA.  Regardless, the court would have to engage in an individualized determination of causation for each putative class member.

Finally, because Plaintiff seeks to represent a class composed of eight years of customers, it is likely that Alabama's two-year statute of limitations for fraud may act as a bar to some of the class member's claims. Ala. Code § 6-2-38(1).  Nevertheless, the application of the fraud statute of limitations is not merely a mathematical calculation.  The statute does not begin to run until "when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care." *Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 417 (Ala. 1997). Thus, each customer's susceptibility to Sears' statute of limitations defense would have to be determined individually, requiring individual assessments of the existence and timing of their awareness of the terms of the warranties or of facts that would lead a reasonable person to discovery of those terms.

Indeed, as these four areas of individualized inquiry illustrate, the suppression and concealment claims may vary widely and materially from customer to customer.  This variation is due, at least in part, to the fact that the alleged suppression/concealment in this case is wholly based upon the particular oral and written representations made by sales representatives at different times and to different customers.  As the former Fifth Circuit noted in *Simon v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973), "[i]f there is any material variation in the

---

[23]Indeed, Plaintiff testified that the particulars of the warranty were unimportant to him. (Granger Depo. at 56, 62).

representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. . . .  [I]f the writings contain material variations, emanate from several sources, or do not actually reach the subject [putative class members] they are no more valid a basis for a class action than dissimilar oral representations."  *Simon*, 482 F.2d at 882.

Those customer-to-customer variations in the claims asserted here are the very reason why the Eleventh Circuit's decision in *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004) is inapposite. In *Klay*, the Eleventh Circuit allowed RICO fraud claims that required reliance as a factor to be certified under 23(b)(3) because: (1) "the existence of a general conspiracy to violate certain federal laws, or a pattern and practice of aiding abetting [others] is an essential element of each individual's cause of action;" and (2) individualized proof of reliance did not prevent common issues from predominating where the defendant is alleged to have made substantially the same representation to all the class members.  *Klay*, 382 F.3d at 1257, 1259.  Here, unlike *Klay*, the individual transactions in which the putative class members bought RPAs involve unique negotiations by different salespeople. Indeed, it is undisputed that some salespersons disclosed the manufacturer's warranty while others did not.  Moreover, as it must be determined whether each putative class member performed a different calculus in deciding whether to purchase an RPA, the court would be required to unpack each of these individual decisions in its analysis of "reasonable reliance."  Likewise, no general conspiracy underlies the fraud claims here – indeed, as noted earlier in footnote 22 *supra,* the only common policy in this case is Sears' policy that its salespersons should disclose the manufacturer's warranty.  Plaintiff has not presented anything to suggest that the variations in how different salespersons put that policy into practice rise to the level of a RICO-like pattern or practice.  Accordingly, this court finds *Klay* to be inapplicable.

30

For all of the reasons enumerated above, including the required individualized inquiries regarding both arbitration and the nature of a class member's claims, common questions of law or fact simply do not predominate over individualized inquiries.  For this alternative reason, class certification is not warranted.

### b.   Superiority

Finally, for the same reasons articulated above as to the predominance requirement, the court finds that the class action vehicle is not "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).   Without question, the superiority analysis is "intertwined" with the predominance analysis.  First, when there are no predominant common issues of law or fact, "class treatment would be either singularly inefficient … or unjust." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 n.12 (11th Cir. 1997).  Moreover, "the greater the number of individual issues, the less likely superiority can be established." *Castano v. American Tobacco*, 84 F.3d at 734, 745 n.19 (5th Cir. 1996).  And finally, the greater the number of individual determinations that must be made, the less manageable a class action becomes. *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1024-25 (11th Cir. 1996). Thus, for this independent reason as well, class certification is not appropriate in this case.

### IV.   Conclusion

Accordingly, consistent with this Memorandum Opinion, the court will enter an order denying Plaintiff's Motion for Class Certification.  Likewise, now that the class issues have been resolved, the court expects that it will order the parties to conduct a prompt mediation in an effort to resolve Plaintiff Granger's claims by agreement.

**DONE** and **ORDERED** this _____4th_____ day of August, 2008.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE